**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL NUMBER 19-507-1** |
| | **:** | |
| | **:** | |
| **ROBERT BRENNAN** | **:** | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION TO SUPPRESS STATEMENTS FOR VIOLATION OF**
**PA. R. PROF'L CONDUCT 4.2 AND 8.4**

Defendant Robert Brennan respectfully submits this Memorandum of Law in further support of his Motion to Suppress Statements for Violation of Pa. R. Prof'l Conduct 4.2 and 8.4 and to specifically counter several assertions and arguments raised in the Government's Response in Opposition to Defendant's Motions to Suppress Statements for Violation of Pa. R. Prof'l Conduct 4.2 and 8.4.

As the government repeatedly remarks, indeed, "[a]n allegation of professional misconduct is a serious matter." Gov't Resp. at 2. Such a charge should only be brought before the Court where there exists evidence—be it direct or circumstantial—that a prosecutor violated her ethical obligations and the Court has within its authority the ability to remedy the harm caused. Both of these factors are present in Mr. Brennan's case. There is more than sufficient evidence to warrant an evidentiary hearing on the disputed facts, and although this case presents novel issues, there is a basis in law for the claim raised and relief sought. Indignation, therefore, has no place here, particularly in light of the gravity of Brennan's situation.[1] The available evidence strongly suggests Ms. Morgan and Mr. Mayne violated Pa. R. Prof'l Conduct 4.2 and

---

[1] Mr. Brennan is 82 years old and faces up to 32 years in prison if convicted.

1

8.4 by facilitating unauthorized communication with Mr. Brennan about a matter in which he was represented by counsel. The Court can and should suppress the statements Mr. Brennan made related to that matter, which include the statements outlined in the Indictment.[2]

    **A. At the time the agents communicated with Mr. Brennan about the S.M. sexual abuse allegations, he was represented within the meaning of Pa. R. Prof'l Conduct 4.2 by Trevan Borum with respect to that subject matter.**

"Rule 4.2 prohibits a lawyer from knowingly communicating with a represented person about the *subject matter* of the representation without the consent of that person's lawyer." ABA Comm. of Ethics & Prof'l Responsibility, Formal Op. 95-396, at 1 (1995) (emphasis added). As such, it is well established that the rule's application is not dependent on whether a formal proceeding has been instituted. *See e.g. Penda Corp. v. STK, L.L.C.*, 2004 U.S. Dist. LEXIS 13577, *11-12 (E.D. Pa. July 16, 2004) (noting that purpose of ABA's amendment replacing "party" with "person" was to clarify that interests sought to be protected by rule may equally well be involved when, for example, litigation is merely under consideration). "By prohibiting communication about the *subject matter* of the representation, the Rule contemplates that the matter is defined and specific, such that the communicating lawyer can be placed on notice of the subject of representation. Thus, if the representation is focused on a given matter, such as one involving past conduct, and the communicating lawyer is aware of this representation, she may not communicate with the represented person absent consent of the representing lawyer." ABA Op. 95-396 at 14 (emphasis added).

Despite this very thorough explanation of the breadth of 4.2 by the rule's promulgating body, the government nevertheless asserts that the rule is "case-specific, not fact-specific."

---

[2] Defense counsel consulted with and obtained an opinion from legal ethics expert, Ellen Brotman, regarding the various ethical issues in this Motion. A copy of her opinion with exhibits is attached collectively as Exhibit A for the Court's review.

Gov't Resp. at 8. In so doing, it relies on a single Illinois state court case in which the Supreme Court of Illinois held that because the drafters of 4.2 used the term "matter" instead of "subject matter" within the rule itself, their omission was deliberate and intended to limit the reach of the rule to a lawyer's representation of a client in a particular case rather than for a particular allegation or set of facts. *Illinois v. Santiago*, 925 N.E.2d 1122, 1130 (Ill. 2010).[3] This interpretation of Rule 4.2 and the rationale underlying it[4] are completely undercut by the drafters' expressed intent regarding the meaning of "matter": "Rule 4.2 prohibits a lawyer from knowingly communicating with a represented person about the *subject matter* of the representation…" ABA Op. 95-396 at 1 (emphasis added).

In this case, Mr. Borum and Mr. Brennan established an attorney-client relationship with respect to the subject of the alleged sexual abuse of S.M beginning in 2013 following Mr. Brennan's arrest. Despite the Commonwealth of Pennsylvania's withdrawal of the criminal charges following S.M.'s death, the attorney-client relationship did not end. Rather, it continued, unchanged, as evidenced by Mr. Borum's representation of Mr. Brennan throughout the five-

---

[3] In *Santiago*, the Court found no violation of Rule 4.2 where a state prosecutor questioned a suspect in a criminal child abuse investigation without first obtaining consent of the lawyer appointed to represent her in a family court child welfare proceeding whose underlying subject matter was identical to that of the criminal investigation. 925 N.E.2d at 1123. As explained immediately *infra* above, this decision is flawed and an anomaly. The government goes on to cite two other cases as analogous examples; however, the analogies fail. For Rule 4.2 to apply to a communication between an attorney and a represented person, the communication must be "about" the subject matter that is the basis of the representation. ABA Op. 95-396 at 1. In *United States v. Ford*, while under indictment for obstruction of justice and jury tampering, the defendant allegedly threatened violence against the prosecutor and other officials involved in his prosecution. 176 F.3d 376, 378-79 (6th Cir. 1999). The Court found no violation of Rule 4.2 where a jailhouse informant, at the direction of the government, attempted to elicit statements from the defendant about his plans to commit violence, because the communication in no way related to the subject matter for which the defendant was represented (i.e. his conduct underlying the jury tampering and obstruction charges). *Id.* at 382. Similarly, in *Griffin-El v. Beard*, the Court found no violation where the plaintiff's counsel contacted an employee of the defendant, because the communication had nothing to do with the plaintiff or the facts underlying his lawsuit against the defendant. 2009 U.S. Dist. LEXIS 81028, *20-25 (E.D. Pa. Sept. 8, 2009).

[4] Deciding Illinois's version of Rule 4.2—which is identical to the ABA's Model Rule—was so "clear and unambiguous" that "resort[ing] to further aids of statutory construction" was unwarranted, the Court failed to consider ABA Op. 95-396; rather, it appears to have based its decision entirely on its plain reading of the rule. *Santiago*, 925 N.E.2d at 1128-29.

year civil lawsuit related to S.M.'s sexual abuse allegations.  Mr. Brennan was dismissed as a

party to that lawsuit in or about 2018 when the suit was settled.  Despite the clear evidence that

the attorney-client relationship between Mr. Brennan and Mr. Borum predated the civil suit, at

all times encompassed the abuse allegations of S.M., and began in the criminal context, the

government baselessly concludes that resolution of the civil suit "complet[ed] the contemplated

services [thereby] bring[ing the] representation to a close."  Gov't. Resp. at 7.  This was not,

however, the nature of this particular attorney-client relationship.

      Mr. Brennan will testify that even after resolution of the civil suit, he regarded Mr.

Borum as "[his] attorney" for purposes of the S.M. allegations.  Though at the close of the civil

lawsuit he hoped and even believed no further legal proceedings would arise related to the

subject of S.M., he will testify that he nevertheless believed the attorney-client relationship with

Mr. Borum remained should he need to seek future legal advice about the past S.M. allegations.[5]

*See* Restatement (Third) of the Law Governing Lawyers § 31 cmt. h (2020) ("A lawyer's

authority ordinarily ends when the lawyer has completed the contemplated services…The course

of dealing[, however] might not clearly indicate what services were contemplated in the

representation or whether the lawyer has a continuing duty to advise the client.  Such uncertainty

could lead to clients assuming that they were still being represented.  Because contracts with a

client are to be construed from the client's viewpoint [], the client's reasonable understanding of

---

[5] Importantly, Mr. Brennan does not assert that Mr. Borum represented him for any other subject matter or *future* conduct; rather, he believed the relationship to be limited to defined, specific *past* alleged conduct—that is, S.M.'s sexual abuse allegations.  This is in line with the scope of Rule 4.2.  *See* ABA Op. at 14-15 ("By prohibiting communication about the subject matter of the representation, the Rule contemplates that the matter is defined and specific, such that the communicating lawyer can be placed on notice of the subject of representation.  Thus, if the representation is focused on a given matter, such as one involving past conduct, and the communicating lawyer is aware of this representation, she may not communicate with the represented person absent consent of the representing lawyer.  However, where the representation is general—such as where the client indicates that the lawyer will represent her in all matters—the subject matter lacks sufficient specificity to trigger the operation of Rule 4.2…A client or her lawyer cannot simply claim blanket, inchoate representation for all future conduct whatever it may prove to be[] and expect the prohibition on communications to apply.")

the scope of the representation controls.  The client's relative sophistication in employing lawyers or lack thereof is relevant.")  Indeed, Mr. Brennan will testify that had the agents or prosecutor put him on notice of their desire to question him about S.M. before showing up to his home, he would have placed a call to Mr. Borum requesting advice as to whether he should speak to them.  He believes, given Mr. Borum's past advice to him concerning making statements to law enforcement, Mr. Borum would have advised him not to speak to the agents.

Caught by surprise, however, when confronted by federal agents in his home and without being advised he had the right to consult with an attorney before speaking to them, he did not immediately think to tell them to call his lawyer.  However, he repeatedly referenced his attorney throughout the interview, including disclosing privileged information, and by its conclusion he directed the agents to Mr. Borum for any further questioning, hence giving them Mr. Borum's contact information.  *See* FBI 302 of 4/26/19 attached as Exhibit B at 1-2, 5; *see also* ABA Op. at 5 ("[T]he prohibition against communications with represented persons operates in a criminal matter to protect a represented person against harmful admissions and waivers of privilege that may result from interference with the client-lawyer relationship.")  That Mr. Brennan could not afford to retain Mr. Borum for a federal criminal trial is immaterial.  As the government notes, "timing is key," Gov't Resp. at 6, n. 5, and the relevant inquiry is whether Mr. Brennan was a represented person at the time of the prohibited communication.

There is ample evidence that, at the time the agents interrogated Mr. Brennan, he retained an attorney-client relationship with Mr. Borum on the subject of S.M.'s sexual abuse allegations. Therefore Rules 4.2 and 8.4 govern the communication specific to that subject matter.[6]

---

[6] The government goes to great lengths detailing how the subject matter of the agents' communication with Mr. Brennan was far broader than the S.M. molestation accusations.  Gov't. Resp. at 9.  Yet this distinction is irrelevant, because, understanding his communications with the agents about subject matter not covered by Mr. Borum's representation are not prohibited by 4.2, Mr. Brennan does not seek to suppress statements he made regarding "other

**B. The available evidence suggests Ms. Morgan and Mr. Mayne knew Mr. Brennan was a represented person within the meaning of Rule 4.2 and that Ms. Morgan's involvement in the decision to interview Mr. Brennan rises to the level of a Rule 8.4 violation; however, even if the Court finds Ms. Morgan did not know he was represented and/or did not induce the otherwise prohibited communication, Mr. Mayne is subject to 4.2 in light of circumstances surrounding his status as a Special Assistant United States Attorney (SAUSA) and Division Counsel for the FBI.**

Ms. Morgan asserts that even if Mr. Brennan was a represented person within the meaning of Rule 4.2, she did not violate the rule because she did not have "actual knowledge of the representation." Gov't Resp. at 6-7. Further, even if she did know he was a represented person, she did not violate Rule 8.4, because she "was not responsible for the interview." *Id.* at 4. Though circumstantial at this juncture, there is evidence, detailed herein, to the contrary. However, even if the Court finds Ms. Morgan did not have actual knowledge of the representation and/or did not assist or induce the agents to engage in prohibited communication with Mr. Brennan, the Court should nevertheless find that Rule 4.2 applies directly to Mr. Mayne—apparently a SAUSA and Division Counsel for the FBI—and that he communicated with Mr. Brennan in violation of it.

### 1. Evidence that Ms. Morgan knew Mr. Brennan was a represented person.

To trigger Rule 4.2, a lawyer, in communicating with or assisting her agent to communicate with a person, must have "actual knowledge" of the person's representation in the matter to be discussed. Pa. R. Prof'l Conduct 4.2 cmt. 8. *"But such actual knowledge may be inferred from the circumstances [and] the lawyer cannot evade the requirement of obtaining the*

---

victims[,]" "whether he knew…or had traveled across state lines with [certain named] minors[,]" "restrictions placed on him within the parishes in which he worked and the nature of his transfers to other parishes[,]" or "his laptop." *Id.* Indeed, "this subject matter was necessarily entirely…outside the purview of the prior state investigation and litigation [regarding S.M.]," *id.*, which is why Mr. Brennan does not claim it is included in the specific, defined subject matter for which Mr. Borum represented him and therefore does not trigger 4.2 protection.

*consent of counsel by closing [her] eyes to the obvious." Id.* (internal citation omitted and emphasis added).

At the time Mr. Brennan was interviewed, Ms. Morgan knew Mr. Borum began representing Mr. Brennan when he was arrested for the alleged molestation of S.M. in 2013. She also knew Mr. Borum's representation with respect to S.M. continued throughout the five-year civil lawsuit in which Mr. Brennan was a named defendant. This information was apparent in the state criminal records and civil depositions and related records in her possession. Given this knowledge, the existence of an attorney-client relationship between Mr. Borum and Mr. Brennan on the subject of S.M. even after the resolution of the civil lawsuit should have been "obvious." At the time of the prohibited communication, less than a year had passed since the suit had been settled—a very short amount of time compared to the five continuous years of documented representation. No other attorney had ever represented Mr. Brennan with respect to S.M.'s allegations. Thus, that Mr. Brennan believed he maintained an attorney-client relationship with Mr. Borum regarding the S.M. matter should have been obvious. Notably, at his initial appearance before the Honorable Lynne Sitarski, counsel even expressed her prior belief that Mr. Brennan was represented, stating she "expected the Defendant to have private counsel." Tr. of 9/5/19, at 4 (attached as Exhibit C). From the totality of these circumstances, the Court can reasonably infer Ms. Morgan's actual knowledge.

### 2. Evidence that Ms. Morgan violated Rule 4.2 through the acts of the interrogating agents.

"It is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another." Pa. R. Prof'l Conduct 8.4(a). Thus, if, for example, Ms. Morgan suggested to the agents that they should attempt to communicate with Mr. Brennan about S.M., she is in violation

of 8.4(a).

Again, there is circumstantial evidence that such a conversation occurred such that an evidentiary hearing is warranted.  Specifically, on March 22, 2019—one month before agents went to Mr. Brennan's house to interview him—FBI Agent Bushner emailed Ms. Morgan.  *See* Def.'s.Mot. to Dismiss for Outrageous Gov't Conduct Exhibit B.  In his email, he detailed the findings to date of the then five-month long investigation into the Catholic Church and attached to his email a 24-page thorough synopsis of completed and outstanding investigation.  *See* Def.'s Mot. to Dismiss for Outrageous Gov't Conduct Exhibit A.  Agent Bushner concluded his email to Ms. Morgan stating, "At the end of the attachment, we delineate the investigative steps that still need to be completed.  As you will see, that list is not all that lengthy. Given my many conversations with Scott [Mayne] over the past several months, as well as my recent meeting with the team, I can say with confidence that this team has been extraordinarily thorough and that this investigation is now on the wind-down…After you have digested this, let me know your thoughts. It may be beneficial to sit down with the entire team[,] as I anticipate your office may want to discuss this further."  With respect to Mr. Brennan, the attachment detailed all of the investigation conducted into all prior sexual abuse allegations against him, including those made by S.M.  *Id.* at 9, 15.  Agent Bushner concludes, "none of the abuse allegations appear to have a federal nexus."  *Id.* at 15.  Absent from Mr. Brennan's section of this report is mention of any further investigation to be conducted, including the need for an interview. [7]  *See id.*  Despite the apparent conclusion of the investigation into Mr. Brennan, agents went to his house on April 25, 2019 and questioned him about, among other topics, S.M.  Notably, they did so in a way that mirrored Mr. Brennan's 2016 deposition in which he stated he did not know S.M. or his family

---

[7] Contrast this with the sections on at least five other priests—Ronald Minner, David Sicoli, Francis Nave, David Soderlund, and Stephen McCarthy—who had been or were targeted to be interviewed according to the report.

members until he was charged in 2013.

Taken as a whole, these circumstances suggest Ms. Morgan conferred with the investigating team after reviewing Agent Bushner's report. She does not deny this in her Response, and she has not provided defense counsel with any information as to her subsequent communications with Agent Bushner or other agents despite defense counsel's supplemental discovery request for said information. The government contends it has no communications responsive to Mr. Brennan's request, yet curiously this is the sole contention raised in Mr. Brennan's Motion to Suppress that the government completely fails to address. There is no evidence in the discovery, nor in the government's Response, to suggest that any new evidence was uncovered to lead Agent Bushner to conduct more investigation than that which was outlined in his Report.

Because Agent Bushner's conclusions about the investigation into Mr. Brennan as of March 22, 2019 strongly suggested he believed there was no additional investigation to be conducted, the Court could reasonably infer that the subsequent interview of Mr. Brennan was at Ms. Morgan's behest. The aforementioned evidence by no means proves this is what occurred; rather, it provides a good faith basis for Mr. Brennan's claim and necessitates an evidentiary hearing.

> ### 3. Rule 4.2 applies directly to Mr. Mayne, and he violated it when he communicated with Mr. Brennan.

Now aware that Mr. Mayne is a SAUSA and Division Counsel for the FBI, rather than simply an FBI agent, Mr. Brennan submits that Rule 4.2 applies directly to Mr. Mayne. *See* Gov't Resp. at 3, n. 1 ("Special Agent Mayne is an attorney and a Special Assistant United States Attorney (SAUSA) in this District"). Mr. Mayne is not just an investigative agent with a law degree as is common among FBI agents; rather, he is a SAUSA in the Eastern District of

Pennsylvania.  *Id.*  The U.S. Attorney's Office designated him as a SAUSA in 2018—just months before it publicly announced its investigation underlying this case—and Mr. Mayne expressed his desire to "litigate a case in the EDPA in 2018."  *See* Special Reinstatement Questionnaire at 12 (attached as Exhibit D).

In this case, Mr. Mayne was intricately involved in the investigation and had access to all available information regarding the 2013 state prosecution and subsequent civil lawsuit against Mr. Brennan.  *See* Def.'s.Mot. to Dismiss for Outrageous Gov't Conduct Exhibits A-B.  For the same reasons raised *supra*, he had actual knowledge that Mr. Brennan was a represented person when he communicated with him.  In so doing, in light of the totality of the circumstances, there is ample reason to believe that he was not simply acting as an investigating agent who happens to possess a law degree but instead was acting in his capacity as a SAUSA, "representing a client," when he communicated with Mr. Brennan.  Therefore, an evidentiary hearing is warranted to determine whether Mr. Mayne is subject to Rule 4.2 and violated the rule by traveling to Maryland to interview Mr. Brennan without contacting his longstanding defense counsel so he could be present or advise Mr. Brennan accordingly.

### C.  The contact was not authorized by law.

While the government is correct that some courts have rejected the argument that overt, pre-indictment contacts are not authorized by law pursuant to Rule 4.2 under certain factual scenarios, others have accepted it and granted relief.  Importantly, the Third Circuit has not rejected the argument, as it has not had occasion to hear it.  The Court's most recent consideration of if and how Rule 4.2 applies in the pre-indictment context was in *United States v. Brown*, the facts of which involved the use of an informant to communicate with a represented target in a federal fraud investigation.  595 F.3d 498, 514-516 (3d Cir. 2010); *see also United*

10

*States v. Balter*, 91 F.3d 427, 436 (3d Cir. 1996) (use of informant, pre-indictment, to communicate with represented defendant is "authorized by law").  "Acknowledg[ing] that the government's conduct in investigating [the represented defendant] g[ave it] pause," the Court ultimately d[id] not regard it as so egregious that it f[ell] outside the realm of acceptable pre-indictment investigation." *Brown*, 595 F.3d at 516.  In so doing, it meaningfully implied that there exists conduct that *is* so egregious to fall outside the "authorized by law" exception in the pre-indictment context.  *Id.*

Such conduct is present in this case and distinguishable from conduct in *Brown* and *Balter* due to its overt nature.  The government's implication that *United States v. Koerber*, 966 F. Supp. 2d 1207 (D. Utah 2013), which adopted this exact reasoning and held that the Government's *overt* contact with a represented person violated Rule 4.2, is an anomaly and should therefore be ignored is misplaced.  *See e.g. United States v. Reece*, 2013 U.S. Dist. LEXIS 184445, *24-27 (W.D. La. Nov. 22, 2013) (*Koerber* is "well-reasoned" and consistent with applicable sections of the United States Attorneys Manual).  The assertion that all pre-indictment investigation is "authorized by law" and therefore cannot violate Rule 4.2 is simply not the current state of the law.

Finally, the government's claim that the portions of the DOJ's Criminal Resource Manual cited in Mr. Brennan's underlying Motion are "seriously outdated" and irrelevant is substantially undercut by the fact that § 296 is "cited in" the current Justice Manual, which was updated in 2020, via hyperlink.  *See* Def.'s Mot. to Suppress Statements for Violation of Pa. R. Prof'l Conduct 4.2 and 8.4 Exhibit A.  Moreover, §§ 296-297 indicate they were "updated" January 22, 2020.  *See* Exhibits A-B.

**D.  Suppression is an Available and Appropriate Remedy in this Case.**

At length, the government, in its Response, initially argues that this Court cannot grant the relief Mr. Brennan seeks—suppression of his statements obtained in violation of the Pennsylvania Rules of Professional Conduct—only to later expressly acknowledge that the Court actually can grant suppression. Gov't Resp. at 15 ("'most courts have determined that suppression must be reserved for only the most egregious violations of the no-contact rule...'" (citations omitted)). Indeed, the Third Circuit has implicitly acknowledged that suppression can be an appropriate remedy under the right set of facts. See Brown, 595 F.3d at 516 n.23 (citing to United States v. Hammad 858 F.2d 834, 841-42 (2d Cir. 1988) in which court declined to grant suppression under a particular set of facts involving use of informant to communicate with represented defendant pre-indictment, but explicitly affirmed suppression is an appropriate remedy under certain circumstances); see also Federal Prosecutors, State Ethics Regulations, and the McDade Amendment, 113 Harv. L. Rev. 2080, 2081 (June 2000) ("[A]n ethics violation raises not only the threat of disciplinary sanctions against an attorney, but also the specter of evidence exclusion in a criminal prosecution—or even the dismissal of criminal charges against a defendant.")

Notably, cases cited by the government, as well as supra, in which courts have either declined to grant suppression despite finding a violation or have gone out of their way to state they would have denied suppression had a violation existed are cases largely involving covert pre-indictment conduct. Such conduct is naturally less egregious, as it by its nature does not involve the intimidation and coercion often felt when encountering and being questioned by law enforcement officials whose identities are known. It is the willful, overt communication in violation of ethical rules meant to protect defendants that is most egregious and therefore suppression-worthy. Courts deciding suppression motions are typically tasked with determining

12

whether the conduct was sufficiently egregious or systemic that it outweighs the societal costs of excluding evidence from a criminal trial and necessitates suppression to deter government overreach or misconduct.  *Cf. United States v. Katzin*, 769 F.3d 163, 170-71 (3d Cir. 2014) (discussing the deterrence rationale in the context of the Fourth Amendment).

Here, there is a good faith basis to believe that not only one, but two barred attorneys employed by the United States Attorney's Office and handling the investigation into Mr. Brennan's alleged conduct either expressly directed, had involvement in, or were willfully blind to a blatant violation of the no-contact rule.  As in *Koerber*, such conduct must be remedied by suppression of Mr. Brennan's improperly obtained statements if justice is to prevail.

**WHEREFORE**, for the reasons set forth in the Defendant's Motions to Suppress Statements for Violation of Pa. R. Prof'l Conduct 4.2 and 8.4, Robert Brennan respectfully requests that this Court suppress the statements referenced in the Indictment.

Respectfully submitted,

*/s/ Catherine Henry*
CATHERINE C. HENRY
Senior Litigator

*/s/ Katrina Young*
KATRINA YOUNG
Assistant Federal Defender

## CERTIFICATE OF SERVICE

We, Catherine Henry, Senior Litigator, and Katrina Young, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that we caused a copy of the Reply Memorandum of Law in Support of Defendant's Motion to Suppress Statements for Violation of Pa. R. Prof'l Conduct 4.2 and 8.4 to be filed and served electronically through the Eastern District Clerk's Office Electronic Case Filing ("ECF") upon Michelle Morgan, Assistant United States Attorney, United States Attorney's Office, 615 Chestnut Street, Suite 1250, Philadelphia, Pennsylvania 19106.

*/s/ Catherine C. Henry*
CATHERINE C. HENRY
Senior Litigator

*/s/ Katrina Young*
KATRINA YOUNG
Assistant Federal Defender

DATE:  August 28, 2020