IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL ACTION |
| | : | No. 19-cr-507 |
| v. | : | |
| | : | |
| ROBERT BRENNAN | : | |
| Defendant. | : | |

## MEMORANDUM

Robert Brennan is charged with four counts of making a materially false statement under 18 U.S.C. § 1001.[1] Mr. Brennan moves to suppress statements he made to FBI agents during an interview at Mr. Brennan's home. Mr. Brennan argues that his statements must be suppressed for three reasons: Assistant United States Attorney Michelle Morgan ("AUSA Morgan") violated the Pennsylvania Rules of Professional Conduct when she directed FBI agents to interview Mr. Brennan who she knew was represented by counsel; the FBI agents failed to give proper *Miranda* warnings; and the agents coerced Brennan into making statements in violation of the Fifth Amendment.

Mr. Brennan bears the burden of proving by a preponderance of the evidence that AUSA Morgan violated the Rules of Professional Conduct.[2] *See United States v. Grass*, 239 F.Supp.2d 535, 539 (M.D. Pa. 2003). The government, however, bears the burden of proving by a preponderance of the evidence, that Brennan's statements were not the product of a custodial

---

[1] The Court exercises jurisdiction under 18 U.S.C. § 3231.
[2] The government argues that Mr. Brennan has the burden of proof and Mr. Brennan has not challenged that assertion. *See* Gov. Resp. in Opposition to Mot. to Suppress for Violation of Pa. R. Prof'l Conduct 4.2 and 8.4 at 4, ECF No. 75. There is a lack of case law on the issue of the burden of proof in a motion to suppress for violations of the Rules of Professional Conduct. "As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). The Court notes that the findings of fact would remain the same even if the burden were placed on the government.

1

interrogation conducted in the absence of *Miranda* warnings. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986). The government also bears the burden of proving by a preponderance of the evidence that Brennan's statements were voluntary and not the product of coercion. *See United States v. Ludwikowski*, 944 F.3d 123, 135 (3d Cir. 2019).

On Wednesday, April 21, 2021, the Court conducted a hearing on Mr. Brennan's suppression motions.[3] Based on the Court's factual findings and legal conclusions, I will deny the motions to suppress.[4]

**I. Findings of Fact**

At the hearing on April 21, 2021, the government presented three witnesses: AUSA Morgan, FBI Supervisory Special Agent Scott Mayne ("SSA Mayne"), and FBI Special Agent Michael Dzielak ("SA Dzielak"). I had the opportunity to evaluate the credibility of AUSA Morgan, SSA Mayne, and SA Dzielak. I considered the quality of each witness's knowledge, understanding, and memory of the events in question; observed each witness's appearance, behavior, and demeanor while testifying; contemplated the interests of each witness in the outcome of this motion; and evaluated each witness's testimony for consistency with the other evidence in this case.

After considering all of the factors that bear on a witness's credibility, I find that AUSA Morgan, SSA Mayne, and SA Dzielak provided credible testimony.[5]

Upon consideration of the testimony and other evidence presented at the hearing, I make

---

[3] Mr. Brennan filed two motions to suppress and the Court considered both at the hearing. *See* Def.'s Mot. to Suppress Statements for Violation of the Fifth Amendment of the United States Constitution, ECF No. 64; Def.'s Mot. to Suppress Statements for Violation of PA. R. Prof'l Conduct 4.2 and 8.4, ECF No. 72.
[4] *See* Fed. R. Crim. P. 12(d) ("[W]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record.").
[5] The Court notes minor differences between SSA Mayne's and SA Dzielak's testimony, but these differences are immaterial and do not alter the ultimate conclusions in this case. For example, SA Dzielak testified that he and SSA Mayne sat on the same piece of furniture while interviewing Mr. Brennan, and SSA Mayne testified that all three individuals sat on separate pieces of furniture.

the following findings:

In October of 2018, the Federal Bureau of Investigation in Philadelphia opened an investigation into the Roman Catholic Church in the Eastern District of Pennsylvania. The investigation stemmed from a report by the Attorney General of Pennsylvania detailing sexual abuse by priests in the Commonwealth. The FBI initiated their own investigation, focusing on uncovering potential federal crimes.

SSA Mayne led the federal investigation and worked with federal prosecutors in the Eastern District of Pennsylvania.[6] AUSA Morgan, then the Deputy Chief of the Criminal Division, was the lead prosecutor for the investigation. Initially, AUSA Morgan's role was to communicate with all of the Archdioceses across Pennsylvania to manage the production of voluminous amounts of discovery. SSA Mayne's role was to supervise a group of agents in culling through the thousands of pages of discovery documents that implicated potentially hundreds of priests in federal offenses. From the documents, SSA Mayne and the agents, not AUSA Morgan, decided whom to interview as part of the investigation.[7]

While reviewing the discovery documents, SSA Mayne determined it was necessary to interview Mr. Brennan, a former priest, as part of the investigation. AUSA Morgan, who as Deputy Chief, oversaw three units of the office, and was tasked with reviewing all indictments and plea-agreements in addition to managing her own caseload, did not discuss the interview with SSA Mayne and played no role in its planning or coordination.

---

[6] SSA Mayne is also an attorney, but did not work as an attorney in any capacity on this investigation.
[7] At one point early in the investigation, SSA Mayne asked AUSA Morgan if there would be any implications for interviewing current Parish-level priests when the Archdiocese was represented by counsel. AUSA Morgan consulted with the Department of Justice's Office of Professional Responsibility and learned that Bishops and Cardinals would be deemed represented by counsel, but Parish-level priests would not be. The Office of Professional Responsibility also informed AUSA Morgan that even if current Parish-level priests were represented, any pre-indictment interview would be authorized by law, and therefore not a violation of the Rules of Professional Conduct.

In the mid-morning of April 25, 2019, SSA Mayne and SA Dzielak drove together in an unmarked car from the FBI's Philadelphia field office to interview Mr. Brennan at his home in Perryville, Maryland. On the drive to Mr. Brennan's home, SSA Mayne and SA Dzielak reviewed plans for the interview. SSA Mayne and SA Dzielak were aware that Mr. Brennan previously faced state criminal charges and a civil lawsuit for allegations of child abuse. The agents discussed their goal of uncovering federal crimes, including the crime of making a materially false statement.

When they arrived, the two agents knocked on the door and Mr. Brennan's roommate, Father John Franey, answered. SSA Mayne and SA Dzielak showed Father Franey introduced themselves with their FBI credentials and asked Father Faney to speak with Mr. Brennan. Father Franey allowed the agents to enter the vestibule of the home and then called out to Mr. Brennan, who was elsewhere in the home, announcing that the FBI was there to speak with him. Moments later, Mr. Brennan walked down the stairs from the second to the first floor and saw the agents in the entryway of his home. The agents told Mr. Brennan they were investigating sexual abuse in the Catholic Church and asked Mr. Brennan if they could speak to him. Mr. Brennan agreed to talk and led the agents into his living room. Father Franey went down a hallway to a different area of the home, where he remained for the duration of the interview.

SSA Mayne and SA Dzielak were dressed in casual clothing and had no visible weapons. Mr. Brennan sat on a love-seat while the agents sat on adjacent furniture. The tone of the interview was cordial and not combative. As lead of the interview, SSA Mayne asked Mr. Brennan about different allegations of sexual abuse that were made against him, including allegations made by S.M. that were the basis of the state criminal case and civil lawsuit.[8] SSA

---

[8] Throughout this opinion, I replace the alleged victim's name with the initials "S.M."

4

Mayne did not explicitly ask, and Mr. Brennan did not explicitly say he presently had an attorney who represented him on matters concerning allegations of sexual abuse. In response to one of SSA Mayne's questions about S.M., Mr. Brennan did however, mention that his attorney told him that S.M. had taken his own life. SSA Mayne did not ask any follow-up questions after Mr. Brennan referenced an attorney because he assumed that Mr. Brennan was referring to his former attorney.

At one point during the interview, SSA Mayne asked Mr. Brennan if the agents could search his computer. Mr. Brennan agreed and signed a consent form. He then invited the agents upstairs, where he kept his computer. SA Dzielak searched the computer, while SSA Mayne and Mr. Brennan continued talking. At times, the topics of conversation turned away from the Catholic Church, and SSA Mayne and Mr. Brennan talked about the nearby Susquehanna River, the recent Easter holiday, the Italian language, the many books Mr. Brennan owned, and Longwood Gardens.

After SA Dzielak finished searching Mr. Brennan's computer, the agents returned to the first floor of the house to leave. As SSA Mayne and SA Dzielak stood in the vestibule of the home prior to leaving, Mr. Brennan handed the agents the business card of Trevan Borum. Mr. Borum was Mr. Brennan's attorney in his state criminal case and civil case. SSA Mayne took the card and did not ask any questions about Mr. Borum. The agents then left. The entire interview lasted approximately 90 minutes.

The day after the interview, on April 26, 2019, SSA Mayne sent an email with AUSA Morgan with the subject line "I would like to talk to you about Robert Brennan – Please read this link and lets [sic] talk for 5 minutes today if possible."
In the email, SSA Mayne included a link to a *Philadelphia Inquirer* article that discussed a

settlement that was reached in a civil lawsuit in 2018 against Mr. Brennan and the Archdiocese of Philadelphia. AUSA Morgan was unable to open the link and asked SSA Mayne how to spell the name of Mr. Brennan's alleged victim, as she was unfamiliar. SSA Mayne's email to AUSA Morgan on April 26, 2019, was the first time AUSA Morgan was made aware that Mr. Brennan was interviewed.

Following the interview, no attorney ever contacted AUSA Morgan, SSA Mayne, or SA Dzielak on behalf of Mr. Brennan. On September 4, 2019, Mr. Brennan was indicted on four counts of making a materially false statement under 18 U.S.C. § 1001. At Mr. Brennan's initial appearance after he was indicted, no private attorney entered an appearance.

## II. Conclusions of Law

Mr. Brennan moves to suppress his statements to SA Dzielak and SSA Mayne. He argues that suppression is warranted for three reasons: AUSA Morgan violated the Pennsylvania Rules of Professional Conduct; the agents failed to give proper *Miranda* warnings; and the agents coerced his statements in violation of the Fifth Amendment. Based on the factual findings, I will deny the motions.

### A. Morgan and Pennsylvania Rules of Professional Conduct 4.2 and 8.4(a)

Mr. Brennan argues that his statements should be suppressed because they were compelled by AUSA Morgan in violation of Pennsylvania Rules of Professional Conduct 4.2 and 8.4(a).

The Pennsylvania Rules of Professional Conduct govern the ethical conduct of attorneys in Pennsylvania. State rules of professional responsibility, such as the Pennsylvania Rules of Professional Conduct, apply equally to federal prosecutors as all other attorneys. *See* McDade Amendment, 28.U.S.C. § 530B ("An attorney for the Government shall be subject to State law

and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State.").

Rule 4.2, also known as the "no-contact" Rule states:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

Rule 8.4(a) states:

> It is professional misconduct for a lawyer to: violate the Rules of Professional Rules of Conduct, knowingly assist another to do so, or do so through the acts of another.

Mr. Brennan argues that Morgan violated Rules 4.2 and 8.4(a) because she deployed SA Dzielak and SSA Mayne as her surrogates to speak with Mr. Brennan, whom she knew to be represented by counsel.

In order for Mr. Brennan to prevail on this motion, the Court must find that: AUSA Morgan authorized the Agents' interview with Mr. Brennan when she knew he was represented by counsel; that Mr. Brennan was currently represented by counsel at the time his statements were elicited; and that suppression is the appropriate remedy. *See United States v. Grass*, 239 F.Supp.2d 535, 539 (M.D. Pa. 2003), *aff'd sub nom United States v. Brown*, 595 F.3d 498 (3d Cir. 2010) (citing *United States v. Veksler,* 62 F.3d 544, 548 (3d Cir. 1995).

No-contact rules, like Rule 4.2, are designed to prohibit adverse counsel from taking advantage of a represented person. *Id.* Indeed, "Congress passed the McDade Amendment in part to combat perceived abuses by federal prosecutors and require them to comply with state no-contact rules." *United States v. Brown*, 595 F.3d 498, 516 (3d Cir. 2010) (citing Note, *Federal Prosecutors, State Ethics Regulations, and the McDade Amendment*, 113 Harvard L. Rev.

7

(2000)). The comments to Rule 4.2 explain the scope of the prohibited conduct:

> The prohibition on communications with a represented person only applies where the lawyer knows that the person is in fact represented in the matter to be discussed. This means that the lawyer has actual knowledge of the fact of the representation; but such actual knowledge may be inferred from the circumstances. See Rule 1.0(f). Thus, the lawyer cannot evade the requirement of obtaining consent of counsel by closing eyes to the obvious.

Pa. R. Prof'l Conduct 4.2, cmt. 8. Because AUSA Morgan did not conduct the interview with Mr. Brennan, AUSA Morgan is only in violation of Rules 4.2 and 8.4(a) if she had "actual knowledge" of Mr. Brennan's representation and directed SA Dzielak and SSA Mayne to interview him despite that knowledge.

I find that AUSA Morgan did not violate Rules 4.2 and 8.4(a) because she did not authorize the interview with Mr. Brennan and had no knowledge as to whether Mr. Brennan was represented by counsel. AUSA Morgan credibly testified that she did not control who was interviewed and that she had no knowledge that Mr. Brennan was going to be interviewed until after the fact. SSA Mayne, as the lead of the investigation, was tasked with determining who to interview, not AUSA Morgan.[9] At most, AUSA Morgan was aware of the FBI's intent to interview current priests, but had no advanced knowledge that SSA Mayne and SA Dzielak intended to interview Mr. Brennan. AUSA Morgan had other responsibilities as Deputy Chief of the Criminal Division and only learned of the interview with Mr. Brennan the day after, when she received an email from SSA Mayne.

Because I find that AUSA Morgan did not authorize the interview with Mr. Brennan, the Court does not need to reach whether Mr. Brennan was currently represented by counsel at the time of the interview and whether suppression is the appropriate remedy in this instance.

---

[9] Although SSA Mayne is an attorney, he was not acting in his capacity as an attorney, and therefore is not subject to the Rules of Professional Conduct.

### B. Mr. Brennan's Pre-*Miranda* Statements

Mr. Brennan moves to suppress statements he made to SA Dzielak and SSA Mayne at his home. Mr. Brennan argues that his statements to the agents must be suppressed because he "was subjected to a custodial interrogation without the benefit of *Miranda* warnings." Def. Mot. to Suppress for Violation of the Fifth Amen. at 9, ECF No. 55. Mr. Brennan argues that his statements must be suppressed because he was in custody when the agents conducted the interview.[10]

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court in *Miranda v. Arizona* held that, under the Fifth Amendment, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). In order to protect a defendant's Fifth Amendment rights, a suspect should be warned that he or she "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Dickerson v. United States*, 530 U.S. 428, 435 (2000) (quoting *Miranda*, 384 U.S. at 479). Absent such warnings, a statement cannot be admitted into evidence. *Id.* at 431-32.

Constitutional protections against self-incrimination are only triggered when a suspect is subject to "custodial interrogation." *Id.* at 444. Custodial interrogation refers to a situation where law enforcement officers initiate questioning "after a person has been taken into custody or

---

[10] Because Mr. Brennan's statements were elicited from express questioning by the agents, Mr. Brennan was subject to interrogation. The parties do not dispute this issue.

otherwise deprived of his freedom of action in any significant way." *Id.* In the present case, the parties do not dispute whether Mr. Brennan was subject to interrogation. Instead, the parties only dispute whether Mr. Brennan was in custody when he was questioned by the agents.

Custody is a term of art that refers to circumstances that "present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). A person is considered to be in "custody" when "he is either arrested formally or his freedom of movement is restricted to the 'degree associated with a formal arrest.'" *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) (citing *United States v. Leese*, 176 F.3d 740, 741 (3d Cir. 1999)) (citing cases). A custodial situation can occur outside of a police station and a formal arrest. *See Orozco v. Texas*, 394 U.S. 324, 326-27 (1969). In determining whether a person is in custody, the key inquiry is whether "'a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.'" *Howes*, 565 U.S. at 509 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1994)).

Courts must employ an objective view of the totality of circumstances when determining custody. *See id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994)). The Third Circuit considers five factors when determining whether a suspect is in custody: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movements; and (5) whether the suspect voluntarily submitted to questioning. *United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006) (internal citations omitted).

Each of the factors identified by the Third Circuit in *Willaman* support a conclusion that Mr. Brennan was not in custody during the interview. First, Mr. Brennan was never placed under arrest and although was never told he was free to leave, Mr. Brennan agreed to answer the

agents' questions. Second, the entirety of the interview took place in Mr. Brennan's home, with Mr. Brennan's roommate down a hall in the home throughout the duration of the interview.

The interview lasted approximately 90 minutes and the agents never restrained Mr. Brennan's movements or used any force or coercive tactics. Mr. Brennan willingly spoke to SSA Mayne and SA Dzielak. The agents began by asking if they could speak to Mr. Brennan and did not hide that they intended to ask questions about sexual abuse in the Catholic Church. Mr. Brennan voluntarily agreed to speak to the agents and then led the agents into his living room for the conversation. During the interview, he even let the agents search his computer and he signed a consent form to that affect. Taking into account all of these factors, it follows that a reasonable person in Mr. Brennan's position would have felt free to decline the interview and ask the agents to leave.

Mr. Brennan argues that because SSA Mayne and SA Dzielak interviewed Mr. Brennan with the explicit purpose of identifying a federal crime, the interview was custodial in nature. Although the agents did interview Mr. Brennan for the purpose of uncovering federal crimes, that on its own, does not render the situation custodial. The totality of the circumstances supports a conclusion that Mr. Brennan was not in custody during the interview and therefore no *Miranda* warnings were necessary.

### C. Voluntariness of Mr. Brennan's Statements

Mr. Brennan also argues that his statements to Agents Dzielak and Mayne should be suppressed because they were coerced in violation of the Fifth Amendment and therefore involuntary. Specifically, Mr. Brennan argues that because he was 82-years old at the time of the interview and the agents knowingly interviewed him outside the presence of his lawyer, his statements were the product of coercion. Def. Mot. to Suppress for Violation of the Fifth Amen.

at 16.

The Fifth Amendment bars "incriminating statements that are involuntary." *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002). Any involuntary statement must be suppressed and cannot be used at trial for any purpose, including impeachment. *See Mincey v. Arizona*, 437 U.S. 385, 398 (1978). A statement is involuntary "when the suspect's 'will was overborne in such a way to render his confession the product of coercion.'" *Lam*, 304 F.3d at 264 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991)). Both physical and psychological coercion can produce an involuntary statement. *See Miller v. Fenton*, 796 F.2d 598, 603 (3d Cir. 1986) (citing *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960). The government bears the burden of proving statements are voluntary by a preponderance of the evidence. *United States v. Ludwikowski*, 944 F.3d 123, 135 (3d Cir. 2019).

Courts must consider the totality of all surrounding circumstances when assessing the voluntariness of a statement. *See Dickerson*, 530 U.S. at 434. The "surrounding circumstances include 'not only the crucial element of police coercion,'. . . but may also include 'the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health.'" *Lam*, 304 F.3d at 264 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *Withrow v. Williams*, 507 U.S. 680, 693 (1993)).

Importantly, a court need not find that a person was in custody in order to determine a statement was involuntary. *See Ludwikowski*, 944 F.3d at 135. A confession or statement may be involuntary, even if the suspect was not in custody under "'special circumstances.'" *Id.* (quoting *Beckwith v. United States*, 425 U.S. 341, 347 (1976)). Therefore, this Court's conclusion that Mr. Brennan was not in custody is not dispositive of whether his statements were involuntary.

In considering the totality of the circumstances, I find that Mr. Brennan's statements were

12

not involuntary or the product of any type of coercion. Again, the interview took place in Mr. Brennan's home, the majority of which occurred in his living room, with his roommate down the hall. The interview was not prolonged and the agents did not threaten Mr. Brennan, yell, or display their weapons. At times, the interview even turned conversational and Mr. Brennan and SSA Mayne discussed casual topics like the Susquehanna River and Longwood Gardens. There is no evidence that the agents used psychological coercion, intimidation, or deception to force Mr. Brennan's statements. Despite his age, there are also no facts to suggest Mr. Brennan suffers from any mental or physical impairment that would make him more susceptible to the pressures of the interview.

Further, this was not a circumstance where the agents deliberately ignored Mr. Brennan's request for a lawyer and continued asking questions. Mr. Brennan never asked to speak with a lawyer and never mentioned that he presently had counsel. Mr. Brennan referenced a lawyer in the context of a question about an allegation of sexual abuse that was the basis of a 2013 state criminal case and a civil lawsuit that terminated in 2018. Then at the end of the interview when the agents were about to leave, he presented SSA Mayne with a business card of the lawyer who represented him in his state criminal case and civil suit. There are no facts to suggest that the agents knew Mr. Brennan was presently represented and deliberately ignored this fact to elicit statements from Mr. Brennan.

Based on all of the circumstances surrounding the interview, I find that the government has met its burden in proving Mr. Brennan's statements were voluntary. Mr. Brennan's will was not "overborne" in such a way that renders his statements involuntary. *Lam*, 304 F.3d at 264. It follows that this interview is not the type of "special circumstance," where a statement can be involuntary, even though Mr. Brennan was not in custody. Suppression is therefore not

warranted.

III. **CONCLUSION**

For the reasons discussed above, I will deny Mr. Brennan's motions to suppress.

                                            ***S/Anita B. Brody***
                                            ANITA B. BRODY, J.

XC: Speedy Trial                              **05-04-2021**

COPIES VIA ECF                     COPIES MAILED <u>05-05-2021</u> to:
                                                          Robert Brennan, defendant